# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| CHRISTINE SUZANNE LYONS | § | |
| | § | |
| V. | § | 1-17-CV-0595-LY |
| | § | |
| LORIE DAVIS | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

TO: THE HONORABLE LEE YEAKEL
     UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules. Petitioner, Christine Lyons, is represented by counsel and has paid the full filing fee in this matter.

Before the Court are Lyons' Application for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1) and memorandum in support of her petition (ECF No. 3), Respondent's Answer (ECF No. 8), and Lyons' Reply (ECF No. 11). For the reasons set forth below, the undersigned recommends that Lyons' Application for Writ of Habeas Corpus be **denied**.

## BACKGROUND

Respondent has custody of Lyons pursuant to a judgment and sentence imposed by the 22nd District Court of Hays County, Texas. A jury found Lyons guilty of capital murder and she was sentenced to life imprisonment without the possibility of parole. Lyons argues she is entitled to federal habeas relief because she was denied the effective assistance of trial counsel and because she is actually innocence.

# STATEMENT OF THE CASE

## A. Factual background

The Third Court of Appeals summarized some of the testimony presented at Lyons' trial as follows:

> [O]n November 18, 2010, ten-week-old B.S. suffered serious injuries at a day-care facility owned and operated by Lyons at her residence in Kyle. EMS was called to the scene in response to a reported "ground-level fall involving an infant." Jonathan Newcomb, one of the paramedics who responded to the dispatch, testified that when he arrived at the residence, he found Lyons "cradling a young infant" who "was in really bad shape." Newcomb recounted that the infant, later identified as B.S., had "probably a three-inch welt on the side of his head, he wasn't breathing properly, he was breathing slowly and just not responding." Newcomb testified that the injuries appeared to be significantly more serious than those that could result from a "ground-level fall," and he immediately took the infant away from Lyons and departed for Dell Children's Hospital in Austin. Before he left, however, Newcomb asked Lyons what had happened to B.S. According to Newcomb, Lyons responded by "point[ing] to a couch in the living room that was sitting on a hardwood floor." On the way to the hospital, Newcomb requested that law enforcement be dispatched to the residence.
>
> Another emergency responder, Officer Diane Talamantes of the Kyle Police Department, testified that she had observed eight children at the residence, including Lyons's four-year-old daughter, M.L. According to Talamantes, Lyons told her that she was the only adult at the residence at the time B.S. fell. After securing the scene and sending the children to the backyard, Talamantes asked Lyons what had happened to B.S. Talamantes recounted that Lyons "said that she had gone to the bathroom; she had placed [B.S.] on the sofa; and she was gone for a short while; she returned and she found [B.S.] on the floor, face up." When Talamantes asked Lyons how B.S. had fallen from the couch to the floor, Lyons "said she didn't know if [M.L.] or [another child] had pulled [B.S.] or pulled the blanket causing [B.S.] to fall." Talamantes further testified that Lyons also divulged that she had not immediately called 911 after discovering B.S. had fallen. Instead, Lyons explained to Talamantes, she had first called her mother, her husband, and B.S.'s mother. Lyons estimated that approximately five to ten minutes had elapsed between the time she discovered that B.S. had fallen and the time she called 911.
>
> Soon after B.S. arrived at the hospital, doctors began performing emergency brain surgery on the infant. Several doctors who had treated B.S. or had consulted on his case testified to the seriousness of B.S.'s injuries. The doctors all testified that

B.S.'s injuries were not consistent with Lyons's description to the police of what had occurred. They explained that B.S. had multiple skull fractures on both sides of his head, significant swelling and bleeding in and around his brain, torn ligaments in his spinal cord, and numerous rib fractures that had predated his head injuries. The doctors testified that it was unlikely that such injuries to the head could have been caused by a fall. Instead, according to the doctors, the injuries were more consistent with what they variously described as "blunt force trauma" to the head, "high force" and multiple impacts against hard surfaces, and "violent" forward movement of the head, resulting in rapid "acceleration and deceleration" of the brain within the skull.

While at the hospital, B.S. died from his injuries. Dr. David Dolinak, the medical examiner in the case, identified B.S.'s cause of death as "blunt force head injury" and testified that the force could have been caused by "a variety of surfaces, anything . . . that's hard and reasonably smooth." He listed possible surfaces as "anything like a countertop, a table, a wall, a door, anything that's fairly hard, fairly flat, fairly smooth." Dolinak ruled the death a homicide and testified that the "violent nature" of the injuries that had resulted in B.S.'s death were not consistent with an accidental cause such as a short fall.

***

Lyons's defensive theory at trial was that Lyons's four-year-old daughter, M.L., had caused the injuries to B.S. Lyons did not call any expert witness to testify in support of this theory (although, as we explain below, she had filed a motion for continuance asking for additional time to secure such a witness). However, other defense witnesses, including Lyons's husband, mother, and fifteen-year-old sister, claimed to have observed M.L. playing "rough" with a baby doll on the night following the incident, including "swinging" the doll through the air and "slamming" its head against a kitchen table, and they testified that they suspected that M.L. had engaged in similar behavior with B.S. The State's expert witnesses, when asked about this theory, testified that such an explanation was unlikely because of the severity of the injuries that B.S. had sustained. According to the State's witnesses, a four-year-old child, in all likelihood, would be physically unable to exert enough force to cause such serious injuries.

Lyons also testified in her defense. According to Lyons, on the day that B.S. was injured, she had left him alone in the living room for approximately six to seven minutes. When she returned to the living room, Lyons recounted, she saw that it was empty. Lyons testified that she then opened the back door and saw M.L. standing on the deck, holding B.S. Lyons explained that she took B.S. from M.L., returned B.S. to the chair in the living room, and saw "a big knot on the right side of his head." Lyons then turned to M.L. and asked her, "Where did you drop him?" Lyons testified that M.L. eventually "pointed to the deck." Lyons acknowledged that she did not immediately call 911 after discovering that B.S. had been injured. She further acknowledged that she had lied to the first responders about how B.S. had been

injured. When asked why she had lied about what had happened to B.S., Lyons testified that she was "scared" of what would happen to her and her daughter if she had told the truth. Lyons accepted responsibility for leaving B.S. alone and unsupervised and agreed that she had been negligent in doing so, but she denied causing his injuries.

*Lyons v. State*, No. 03-12-00474-CR, 2015 WL 895343, at *1-2 (Tex. App.–Austin 2015, pet. ref'd).

**B.    Procedural Background**

A grand jury indictment returned February 3, 2011, charged Lyons with one count of capital murder of a child under six years of age. (ECF No. 9-3 at 6). Trial was set for March 12, 2012. Lyons was initially represented by retained counsel, Mr. Trumpler, who filed numerous pretrial motions. On November 14, 2011, counsel moved for appointment of a forensic pathologist expert witness. (ECF No. 9-3 at 34-45). The motion for appointment of an expert was denied, but the order denying the motion does not appear in the record. (ECF No. 9-43 at 48).[1] On December 14, 2011, Lyons filed a statement of indigence, asking the court to appoint counsel. (ECF No. 9-3 at 50-54). On

---

[1] In an affidavit filed in Lyon's state habeas action, Lyons' mother stated:

> Christina retained an attorney, Jason Trumpler, on November 19, 2010. Mr. Trumpler informed us in the fall of 2011 that he needed additional funding to secure the assistance of a forensic pathologist to evaluate [B.S.]'s injuries and what could have caused them. I informed him that our family would not be able to pay for an expert. Mr. Trumpler filed a motion to withdraw as Christina's attorney on December 21, 2011 after the Court refused to grant him the funding to hire an expert. The Court granted his motion on January 20, 2012.

(ECF No. 9-43 at 48).

In an affidavit filed in Lyons' state habeas action, Mr. Payan averred:

> Jason Trumpler had been the previous retained attorney and was removed in December 2011, by the trial court, after he requested funding for medical experts. Respondent was appointed to represent Petitioner, Mrs. Lyons on January 17, 2012 as her trial attorney.

(ECF No. 9-44 at 75).

4

December 27, 2011, Mr. Trumpler moved to withdraw. (ECF No. 9-3 at 55). On January 20, 2012, the trial court granted counsel's motion to withdraw and appointed Mr. Payan as counsel. (ECF No. 9-3 at 55, 59-60, 104).

Mr. Payan filed numerous pretrial motions, including a motion to suppress Lyons' statements to law enforcement. (ECF No. 9-3 at 61-62, 65-66). On March 22, 2012, the trial court granted a motion for appointment of a defense investigator. (ECF No. 44 at 43). On May 1, 2012, the court granted a motion for the appointment of a non-testifying defense expert and for a second defense counsel. (ECF No. 9-44 at 44, 46). The court granted a motion for a second non-testifying defense expert on May 24, 2012. (ECF No. 9-44 at 44-45). A defense motion to continue the trial date was denied. (ECF No. 9-3 at 110).

Lyons testified at her trial. The jury was charged on both capital murder and the lesser-included offense of injury to a child by criminal negligence. (ECF No. 9-3 at 143-48). On July 2, 2012, the jury found Lyons guilty of capital murder and she was sentenced to a term of life imprisonment without parole. (ECF No. 9-3 at 149, 154).

Lyons filed a motion seeking a new trial, which was denied by operation of law. (ECF No. 9-3 at 157). Lyons appealed her conviction through her trial counsel, asserting: (1) the trial court abused its discretion by denying her motion for a continuance to seek an expert witness; (2) the trial court erred by denying her motion to quash the indictment; (3) the trial court abused its discretion by admitting hearsay evidence; (4) the trial court erred by admitting evidence in violation of the Confrontation Clause; and (5) the trial court abused its discretion by excluding evidence critical to the Lyons' theory of the case. *Lyons*, 2015 WL 895343, at *1. The Third Court of Appeals affirmed Lyons' conviction in a decision filed February 26, 2015. *Id.* The Court of Criminal Appeals granted

Lyons' motion to substitute counsel. *Lyons v. State*, No. 03-12-00474-CR, 2015 WL 2065955, at *1 (Tex. App.–Austin 2015). A motion for rehearing was denied. (ECF No. 9-37). The Court of Criminal Appeals refused a petition for review, with two judges dissenting. (ECF No. 9-1).

Lyons filed a counseled application for state writ of habeas corpus, asserting her actual innocence and that she was denied the effective assistance of trial counsel. (ECF No. 9-42 at 65-131; ECF No. 9-43 at 1-53; ECF No. 9-44 at 1-47). Attached to these pleadings are numerous affidavits of Lyons' family and friends, who averred that M.L. admitted to them she had injured B.S., that they had personally observed M.L. being rough with other children, and that M.L. was physically capable of inflicting injury to a child the age and size of B.S. (ECF No. 9-43 at 47-53; ECF No. 9-44 at 1-47). These individuals further asserted Lyons' trial counsel did not contact them to discuss their observations. *Id.* Also provided in the state habeas action was the affidavit of a forensic pathologist who opined that, at the time of his death, B.S. exhibited signs of healing rib fractures which likely occurred prior to being placed in daycare, probably because he had brittle bones as a result of his premature birth. (ECF No. 9-43 at 39). The doctor further stated it was eminently possible that M.L. had caused the injuries resulting in B.S.'s death. (ECF No. 9-43 at 40). The doctor averred:

> I believe that the lack of a consulting pathologist in this case prejudiced the Applicant's defense and that legitimate forensic medical issues were not brought to the jury's attention. Had I been contacted by the defense in this case, I would have been available to examine the microscopic slides made of the autopsy tissues including those of the posterior rib fractures, form my own opinions as to their age and to testify consistent with this affidavit for the defense. After my review of the materials in this case provided by writ counsel, I would have questioned seriously the conclusion set forth by the medical examiner in this case. I would have provided expert assistance for cross-examination purposes and would have been in a position to put forward my own opinions in opposition to those of the medical examiner called by the prosecution.

*Id.*

The habeas trial court, which was also the convicting court, found Lyons failed to present any new evidence to support her claim of actual innocence and that she was not denied the effective assistance of counsel. (ECF No. 9-44 at 81-83; ECF No. 9-45 at 1). On June 14, 2017, the Court of Criminal Appeals denied the writ without written order on the findings of the trial court. (ECF No. 9-41).

C.   **Petitioner's Federal Habeas Claims**

Lyons argues her trial counsel failed to interview and call witnesses and failed to obtain an expert witness. She further asserts she is actually innocent of the crime of conviction. Respondent allows that the petition is timely and not successive, and that Lyons exhausted her claims in the state courts. (ECF No. 8 at 6).

## ANALYSIS

A.   **The Antiterrorism and Effective Death Penalty Act of 1996**

The Supreme Court summarized the basic principles established by the Court's many cases interpreting the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA") in *Harrington v. Richter*, 562 U.S. 86, 97-100 (2011). Section 2254(d) permits the granting of federal habeas relief in only three circumstances: (1) when the state court's decision "was contrary to" federal law as clearly established by the holdings of the Supreme Court; (2) when the state court's decision involved an "unreasonable application" of such law; or (3) when the decision "was based on an unreasonable determination of the facts" in light of the record before the state court. *Id.* at 100, *citing Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the

7

state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). Under the unreasonable application clause of § 2254(d), a federal court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, "but unreasonably applies that principle to the facts of the prisoner's case." *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000) (quotation marks and citation omitted). A reviewing federal court presumes the state court's factual findings are sound unless the petitioner rebuts the "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010). This presumption extends to both express findings of fact and to implicit findings of fact by the state court. *Register v. Thaler*, 681 F.3d 623, 629 (5th Cir. 2012).

**B.    Merits**

    **1.    Ineffective assistance of trial counsel**

Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on an ineffective assistance of counsel claim, a federal habeas petitioner must establish that his counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 687. A habeas petitioner has the burden to prove both prongs of the *Strickland* test. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008).

When deciding whether counsel's performance was deficient, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the

challenged action might be considered sound trial strategy." *Strickland*, 466 at 688-89. Federal habeas courts presume that counsel's choice of trial strategy is objectively reasonable unless clearly proven otherwise. *Id.* at 689. Counsel's strategic choices, made after a thorough investigation of the law and facts relevant to plausible options, are virtually unchallengeable. *Strickland*, 466 U.S. at 673; *Pape v. Thaler*, 645 F.3d 281, 289-90 (5th Cir. 2011).

Counsel's performance cannot be considered deficient or prejudicial if counsel fails to raise a non-meritorious argument. *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007); *Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006). Similarly, trial counsel's failure to object does not constitute deficient representation unless a sound basis exists for objection. *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997). If a state appellate court found a claim based on state law without merit, counsel's failure to assert the claim cannot be found prejudicial. *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013).

### a. Failure to investigate

Lyons contends counsel failed to interview crucial witnesses and failed to call these witnesses at trial. She contends: "Counsel failed to contact a majority of the potential witnesses even though they could be used to support the alternate defense theory that [M.L.], the Petitioner's daughter, caused the injuries." (ECF No. 3 at 20). Lyons presented these claims in her state habeas action, and relief was denied.

Mr. Payan filed an affidavit in the state habeas action, stating:

> Respondent received the first defense witness list from Petitioner's family around March 23, 2012 from Cindy Cook. It was well organized and contained a list of people who knew Christina both professionally as well as socially. I provided this list to my investigator and he began by contacting the families whose children attended the day care at the time of the incident. By June 10, he had contacted or

9

attempted to contact everyone on the list. He successfully spoke with Tammy Forasory, Lindsey Sutton, and Christine Mitchell, who were willing to speak to him. He also spoke with Kelli Daly, who stated she did not want to be involved. Many of the others he contacted did not wish to speak to him and many refused to return his calls. Defense counsel personally spoke with multiple witnesses and potential witnesses in preparation for trial.

The defense called 9 witnesses to testify at trial. The defense called a psychologist, several eye witnesses who were at the scene as well as family members who could testify about the character of the Petitioner as well as the defense alleged in this writ. Respondent did not call everyone he or his investigator spoke with at trial to testify. Many of those witnesses would only be cumulative to what was actually presented at trial. The defense presented at trial was that the defendant did not commit this murder, her daughter [M.L.] injured the child. In support of this, the defense called Robert Lyons, Mikayla Cook, Cynthia Cook and Petitioner to testify about what [M.L.] said and did. Respondent also called [M.L.] to the stand, she was 5 years of age at the time, but she would not enter the court room. V 11, pg. 118. Petitioner's defense that another person committed the offense was presented to the jury. At trial we presented Petitioner's defense through multiple witnesses. Contrary to what the writ application states on page 3, that the Petitioner's husband did not testify, he in fact did testify during the trial, twice. He described to the jury that the defendant was loving and caring, and did not yell at the children and was never violent. V6, pg 142. He also testified about [M.L.'s] admissions of injuring the deceased child, even testifying about his interaction with [M.L.] an hour after the child had been removed from the home. See V6, pg 127-134.

Mikayla Cook, Petitioner's much younger sibling, testified about [M.L.'s] admission that she harmed the deceased. Mikayla was perhaps the most persuasive and damaging witness to the state's case. She interacted with [M.L.] just hours after the injury, while the adults were in another room in the Cook's home. Mikayla, who was at the time 15 years of age, was playing with [M.L.] inside the house, with a doll which [M.L.] kept sliding down a play slide very similar to the one at the Lyons' home. V 12, pg. 53, 83. Mikayla described [M.L.] as competitive, and would play rough with other children. V 12, 60. The defense attempted to introduce the hearsay statements of [M.L.] through Mikayla's testimony, but the trial court sustained the state's objections. V12, pg. 82. Mikayla was able to testify about how she saw [M.L.] take her baby doll and swing it into the corner of the kitchen table, striking the back of the doll's head on the edge of the table, a blow which bore striking similarities to the mechanism of injury that Dr. Dolinak had testified about. V 12, pg. 85. Mikayla testified that she believed this is what [M.L.] did to the victim. V 12, pg. 93.

Cindy Cook, Petitioner's mother, also testified about what Petitioner had told her after the police left the home. She stated to the jury her belief that [M.L.] and Sadie Sutton took the baby outside and hurt the baby. V6, pg 189-196. She also described Petitioner as non-violent, never hitting anyone or ever showing anger towards children. Further, that after she started her antidepressants she no longer had the crying depression from the [postpartum] depression she had suffered after [M.L.'s] birth. See, V 6, pg. 198-199.

Lindsey Sutton also testified for the defense. She described Petitioner as someone who never got angry or cross with the children, someone who was very dedicated to the health safety and welfare of the children in her care. See, V 12, pg. 36-7. She also testified that she believed [M.L.] killed the child, based upon her observations of Petitioner and her observations of [M.L.]. V 2, pg. 39. Sutton also described a situation that she personally observed the Friday before this incident, where in she saw [M.L.] grab and squeeze the baby, Christina was forced to separate her from the baby, and how [M.L.] attempted to grab the baby away from Christina. V 12, pg 32. This incident caused great concern on Mrs. Sutton's part and she was afraid of what [M.L.] might do.

Lori Wimberly also testified. She told the jury that she owns another registered home day care about a mile from the Lyons home. She and Christina had been friends for about ten years. V 12, pg. 123. They would speak almost daily, helping each other run their respective businesses. Vl2, pg. 124. She talked about how Christina was an occasional smoker, and how Mrs. Wimberly was aware of Christina's depression and her use of antidepressants. V 12, pg. 127. Mrs. Wimberly spoke about how a day care providers own biological children are the most difficult to handle, and how she and Christina would trade their own kids to help each other out. VI 2, pg. 128. She described Christina as calm, comfortable and very easy going. Id. Mrs. Wimberly testified that she never saw Christina discipline a child in a physical way. YI 2, pg. 129. Mrs. Wimberly has provided day care for [M.L.] since the incident, and described her as 'big for her age'. Vl2, pg. 130. She also described her as 'very strong for her age', and has an older brother that influences her, making her a 'tough little girl'. Id. Mrs. Wimberly also described Christina as a 'very kind person'. V l 2, pg. 138.

(ECF No. 9-44 at 77-79).

The habeas trial court found Mr. Payan's affidavit "to be generally credible," and that his "efforts to investigate and obtain witnesses for trial fell within the wide range of reasonable effective assistance of counsel." (ECF No. 9-44 at 81). The court further found the testimony proffered in the

affidavits of Lyons' friends and family was presented at trial "through the same or other witnesses." *Id.* Additionally, the court determined the proffered testimony "as to statements made by M.L. inculpating M.L. in the death of the alleged victim were offered by trial counsel," and noted it had "sustained the State's hearsay objection to testimony of witnesses as to statements made by M.L. inculpating M.L. in the death of the alleged victim." (ECF No. 9-44 at 82). The trial court concluded that "[c]ounsel's decision not to present cumulative testimony does not constitute ineffective assistance," and that Lyons had not "demonstrate[d] any error on the part of trial counsel." *Id.*

The state court's denial of this claim was not an objectively unreasonable application of *Strickland*. The state habeas court's factual determinations, including credibility findings, are entitled to a presumption of correctness. *Miller v. Thaler*, 714 F.3d 897, 903 (5th Cir. 2013); *Richards v. Quarterman*, 566 F.3d 553, 563-64 (5th Cir. 2009). The presumption afforded factual findings is even stronger when, as in this matter, the state habeas judge making the findings is also the convicting court. *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).

*Strickland* requires counsel to either undertake a reasonable investigation or make an informed strategic decision that investigation is unnecessary. 466 U.S. at 690-91; *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013). The state habeas court found, as a matter of fact, that counsel conducted an adequate investigation with regard to potential witnesses. This conclusion is supported by the record in this matter. Accordingly, the state court's determination was not an unreasonable determination of the facts in light of the record. The state habeas court's conclusion that the proffered testimony would have been cumulative to that presented at trial is also supported by the record. Therefore, the habeas court's denial of this ineffective assistance of counsel claim was a reasonable application of *Strickland*, because counsel is not ineffective for failing to call witnesses

12

whose testimony would have been cumulative to that presented at trial. *Garza*, 738 F.3d at 680; *Trottie v. Stephens*, 720 F.3d 231, 245 (5th Cir. 2013).

      b.      **Failure to retain an expert witness**

Lyons contends Mr. Payan's performance was deficient because he failed to retain an expert forensic pathologist for the defense. She argues: "Had counsel obtained the assistance of an expert pathologist to testify at trial, . . . information would have been provided to the jury in support of the defense that another person, not the Petitioner, caused the death of the complainant." (ECF No. 3 at 28-29). Lyons references the affidavit of Dr. Radelat, an expert pathologist, that B.S.'s injuries "could" have been caused by M.L. (ECF No. 3 at 30). Lyons construes Dr. Radelat's affidavit as "show[ing] that [M.L.], not Christina, caused the death of the complainant . . ." *Id.*

Lyons presented this claim in her state habeas action, and relief was denied. Counsel's affidavit in the state habeas action states:

> I approached the trial court ex parte, and had him sign motions for an investigator, Rick Ojeda, as well as a non testifying medical expert, Jill Hunter M.D. Dr. Hunter is a neuro-radiologist, I provided her with the paper medical records that I had and she requested the MRI and CT scans of the child. The state did not provide those records until May, and I provided them to her on May 17, 2012. I spoke with Dr. Hunter about her findings on May 23 and then followed up with additional questions on June 13. During the May 23 conversation she made it clear that she would not be able to support the defensive theory, and recommend that I get a pathologist who had some experience with short falls in young children.
>
> I had begun my search for a pathologist in March of 2012. I spoke via phone and email to more than 6 different pathologists around the country. None of these doctors would commit to being an expert in the case with a trial date set in June. It was not until Dr. Hunter affirmatively stated that she could not testify that I filed the motion for continuance asking for the time necessary to get an expert to assist. It was up to that point that I had hoped Dr. Hunter would be able to testify about the forces used on the body and that a 4 year old would be able to generate them. I knew Dr. Dolinak would testify and Ira Davis was preparing the cross on him. I also knew that Dr. Dolinak would testify about the variable injury dates on the rib fractures. Since

Dr. Hunter would not commit until she had reviewed the scans, and I needed to be able to put that information into the affidavit, I could not go forward with a motion for continuance until I had received confirmation from her. From May 26 through June l, 2012 I was in another capital murder trial in Travis County, *State v. Lester Guy*. l had informed the Hays County judge that I would be in that trial and would need additional time on the *Lyons* case. He told me to file my motion for continuance and I did on May 30, 2012 and a hearing on the issue was held on June 6, 2012. That motion was denied, and based upon certain statements by the trial judge, I filed an ex parte motion for continuance. The ex parte motion contained detailed information about the conversation had with the non testifying expert and revealed trial strategy, all in an attempt to get the trial judge to grant the motion. The trial court again denied the motion on the record in open court.

My search for pathologists continued and eventually I was directed to one who would consider assisting me. I first spoke with Dr. Edward Wiley, a pathologist out of Florida on June 5, 2012. He stated that he could not be ready for trial in time but would review the materials and provide an affidavit. I immediately over nighted the paper files, scans and relevant photos to him. He provided an affidavit at the end of June and I incorporated it in the motion for new trial.

(ECF No. 9-44 at 75-76). Counsel further stated:

The Petition also discusses the failure to retain the services of a pathologist who would have testified about the fragility of the victim's bones due to his vitamin deficiency and premature birth. This information was provided to the jury throughout the course of the trial. Dr. Gael Lonergan testified about what she saw in the radiological scans done on the victim both after birth and post injury. She discussed the rib fractures she saw on the scans showed healing, which meant some predated the incident. V8, pg. 145-6. Dr. Timothy George was questioned about bone fragility and how vitamin deficiency can cause a weakening of the bones making them break easily. V8, pg 194-5. Dr. David Dolinak testified that the several of the rib fractures predated the November 18 incident by as much as 2 weeks. VI 0, pg. 142-146. He clearly established that the posterior fractures near the spine occurred weeks before the 18th when the deceased was not at the daycare. V 11, pg 29-32. Some of the rib fractures, those near the breast bone were caused on the day of the incident, due to the lack of healing. Id. The defense even produced an exhibit for the jury showing the relevant dates and the potential dates of injury. See Defense Exhibit 1. Finally, Dr. Dolinak stated that 'young children can kill younger children'. VJ I. pg. 46. The defense argued in closing that vitamin deficiencies cause bone fragility and this explains why the deceased child had so many injuries and why the bones in the head were broken the way that they were. V 14, pg 58 et seq.

(ECF No. 9-44 at 79).

The habeas court concluded trial counsel's "attempts to obtain an expert witness for use at trial fell within the wide range of reasonable effective assistance of counsel." (ECF No. 9-44 at 82). The court further determined "Dr. Radelat's proffered testimony is consistent with the probative facts available to the jury at the trial," and that any conflict between Dr. Radelat's opinions and "the testimony at trial, [were] insufficient to support a finding of a reasonable probability that the outcome of the trial would have been different had Dr. Radelat testified to the contents of his affidavit." (ECF No. 9-44 at 83). The state habeas court concluded counsel was not ineffective because the proffered testimony of a forensic pathologist would have been cumulative to the testimony presented at trial. (ECF No. 9-44 at 68).

In denying all of Lyons' ineffective assistance of counsel claims, the habeas court stated: "Petitioner has failed to demonstrate by a preponderance of the evidence that she was denied effective assistance of counsel." (ECF No. 9-45 at 1). Lyons argues that the state habeas court erred by requiring her to show she was prejudiced by counsel's error by a preponderance of the evidence, rather than applying *Strickland*'s "reasonable probability" test. (ECF No. 11 at 8). However, considering the findings of fact and conclusions of law in its entirety, the habeas court utilized the correct standard for determining whether counsel was ineffective. The court recited and applied *Strickland*'s "reasonable probability" standard in its prejudice analysis, (ECF No. 9-44 at 83-84), while determining that Lyons had not met her burden of proof in the state habeas action. (ECF No. 9-45 at 1). *See Holland v. Jackson*, 542 U.S. 649, 654 (2004); *Ex parte Medina*, 361 S.W.3d 633, 648 (Tex. Crim. App. 2011).

Under the AEDPA standard of review, the state court's denial of relief on this claim was not an unreasonable application of *Strickland*. Counsel diligently sought a forensic pathologist who

would testify as to the defense theory of the case and, when unable to locate an expert who could testify at the time set for trial, he moved for a continuance. When denied the continuance, counsel elicited from other witnesses the desired testimony as to the possibility that M.L. could have caused B.S.'s injuries because of her size and B.S.'s physical characteristics. Counsel's performance was not, therefore, below prevailing professional norms and the state court's conclusion on this point was not unreasonable. The state court's finding that the proposed testimony was cumulative and, therefore, that counsel's alleged error was not prejudicial, was not an unreasonable application of *Strickland*. Accordingly, Lyons has not met her burden of establishing a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

2.   **Actual innocence**

Lyons raised a claim of actual innocence in her state habeas action, and the trial court concluded her "proffered evidence" did not constitute "clear and convincing evidence" such that "no reasonable juror would have convicted [her] in light of the new evidence." (ECF No. 9-44 at 81, 83).

The state court's denial of this claim was not clearly contrary to or an unreasonable application of clearly established federal law as dictated by the United States Supreme Court. Lyons argues that "Federal courts *__have__* discerned a constitutional right, enforceable in federal habeas proceedings, to freedom from convictions later shown to be erroneous on the sole basis of newly discovered evidence," citing to decisions by the Eighth and Second Circuits. (ECF No. 3 at 31) (emphasis in original). However, Lyons does not cite any United States Supreme Court decision establishing a "free-standing" claim of actual innocence cognizable in a section 2254 action, because no such opinion exists. The source of doctrine on which a federal court may rely in addressing a section 2254 claim does not include the federal Circuit Courts of Appeal. *See Williams*, 529 U.S. at

381-82; *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013); *Evans v. Davis*, 875 F.3d 210, 215 (5th Cir. 2017) ("This circuit's precedents plainly do not constitute 'clearly established Federal law, as determined by the Supreme Court.' 28 U.S.C. § 2254(d)(1)"). The controlling United States Supreme Court precedent is that a claim of actual innocence is not cognizable in a federal habeas proceeding absent a constitutional violation during the defendant's criminal proceedings. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). Therefore, the state court's denial of Lyons' actual innocence claim was not contrary to, or an unreasonable application of, "clearly established Federal law, as determined by the *Supreme Court* of the United States." 28 U.S.C. § 2254(d) (emphasis added).

Furthermore, the clearly established federal law with regard to a claim of actual innocence requires the petitioner to present "newly discovered evidence" in support of their claim. *Herrera*, 506 U.S. at 400. The state habeas court found Lyons failed to present any new, affirmative evidence of her actual innocence in the state habeas proceeding. (ECF No. 9-44 at 82). This factual finding was not unreasonable in light of the record before the state court. Accordingly, because Lyons failed to present newly discovered evidence in support of her actual innocence, even if the claim was legally tenable the state court's denial of relief was not an unreasonable application of federal law.

## CONCLUSION

Lyons has not established that her trial counsel's performance was deficient or that she was prejudiced by the alleged deficiencies and, therefore, the state court's rejection of her *Strickland*

claims was not clearly contrary to or an unreasonable application of federal law. Lyons' claim of actual innocence is not cognizable in a section 2254 action.

## RECOMMENDATION

It is, therefore, recommended that Lyons' Application for Writ of Habeas Corpus (ECF No. 1) be **DENIED**.

## CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*

In this case, reasonable jurists could not debate the denial of the section 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484. Accordingly, it is respectfully recommended that the Court not issue a certificate of appealability.

**OBJECTIONS**

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985).

SIGNED this 12th day of June, 2018.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE